UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>**CALPINE CORPORATION, et al.,**<br><br>    Debtors. | Bankr. Case No. 05-60200 |
| **CALIFORNIA DEPARTMENT OF WATER RESOURCES, et al.,**<br><br>    Plaintiffs,<br><br>- against -<br><br>**CALPINE CORPORATION, et al.,**<br><br>    Defendants. | 05 Civ. 10842 (RCC)<br>05 Civ. 10861 (RCC)<br>05 Civ. 10875 (RCC) |
| **CALPINE KENNEDY OPERATORS, et al.,**<br><br>    Plaintiffs,<br><br>- against -<br><br>**FEDERAL ENERGY REGULATORY COMMISSION,**<br><br>    Defendants. | 06 Civ. 624 (RCC)<br><br><br><br>**MEMORANDUM & ORDER** |

**RICHARD CONWAY CASEY, United States District Judge:**

   This is a case about power, in several senses of the word. The issue is whether a district court has the jurisdiction to authorize the rejection of several federally regulated executory contracts

for the sale of electric power as part of a bankruptcy reorganization, or whether Congress granted exclusive jurisdiction over such contracts to the Federal Energy Regulatory Commission ("FERC"). The Court ordered the parties in this matter to brief the following issues: (1) what forum has the authority to reject wholesale energy contracts subject to regulation by FERC, and (2) if this Court has jurisdiction, what the appropriate legal standard is for rejection of those contracts. For the following reasons, the Court finds that it lacks subject matter jurisdiction to authorize rejection of the energy contracts at issue and thus does not reach the second issue of what standard should be applied at a rejection hearing. Having determined that FERC has exclusive jurisdiction over the disposition of the energy contracts in this case, the Court vacates the temporary restraining order currently restricting FERC from determining the disposition of the energy contracts.

**I.    BACKGROUND**

Following the California energy crisis of 2000-2001, a crisis in large part created by California's over-reliance on the energy spot market, the FERC "strongly urge[d]" electric utilities to enter into long-term power purchase agreements so that they could avoid the volatility of the spot market. See San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Servs., 93 F.E.R.C. ¶ 61,294, at 61,993 (2000). Calpine Corporation et al. ("Calpine" or "Debtor[s]"), the debtor and debtor-in-possession in this matter, is a federally-regulated public utility involved in, among other things, the sale of electricity, that entered into long-term wholesale power agreements, several of which are at issue here (the "Power Agreements"). The counter-parties to the Power Agreements are Pacific Gas and Electric, Southern California Edison, the California State Parties,[1] Strategic

---

[1] The California State Parties consist of the California Department of Water Resources; the California Electricity Oversight Board; and the People of the State of California, ex rel. Bill Lockyer, Attorney General of the State of California.

Energy, and the Northern California Power Agency (collectively the "Counter-Parties"). There is no dispute that, after they were memorialized in private negotiations between Calpine and the Counter-Parties, the Power Agreements were duly submitted to FERC and complied with the rules and regulations for filing of such agreements.[2]

In recent years, Calpine more than doubled the number of its power plants, the rapid expansion primarily funded by incurring considerable debt. Obligations to service this debt, in addition to the sharp rise in natural gas prices—Calpine operates the largest fleet of natural-gas fired power plants in North America—resulted in Calpine filing a voluntary petition for reorganization under the Bankruptcy Code on December 20, 2005.

The day before, on December 19, 2005, the California State Parties anticipated the bankruptcy filing and commenced a proceeding with FERC, <u>California Electricity Oversight Board v. Calpine Energy Services, L.P.</u>, No. EL06-30-000 (the "FERC Proceeding") by filing a petition ("FERC Petition") that sought an order requiring Calpine to continue performing under the power purchase agreement between Calpine and the California Department of Water Resources, the Calpine 2 contract. On December 21, 2005, Calpine commenced an adversary proceeding against FERC in the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court"), 05-03571-BRL, in which Calpine sought a preliminary injunction and received an <u>ex parte</u> temporary restraining order enjoining FERC from requiring Calpine's compliance and continued

---

[2] The issues in this case do not require the Court to inspect the specific terms of each of the Power Agreements, and inasmuch, the Court need not summarize them. For a general summary of the requirements under the Power Agreements, see Posoli Aff. ¶¶ 16-27.

performance under any of the power purchase agreements ("TRO Proceeding").[3] Also on December 21, 2005, Calpine filed a motion in the Bankruptcy Court for entry of an order authorizing debtors to reject certain energy contracts (the "Rejection Motion") pursuant to 11 U.S.C. § 365(a). Having conducted an extensive review of its contract obligations, Calpine requested the rejection of the Power Agreements because they were determined to be the "most financially burdensome" of all of Calpine's energy contracts. (Posoli Aff. ¶ 13.) Specifically, Calpine sought rejection because "electricity prices fixed in the [Power Agreements] are significantly lower than prevailing electricity prices" (Rejection Motion ¶ 26), and noted that "[w]e are ready and willing to supply the same amount of wholesale electric power–but at competitive market prices" (Posoli Aff. ¶ 28). A hearing was set for January 5, 2006 to decide whether the Power Purchase Agreements should be rejected.

On December 29 and 30, 2005, the Counter-Parties filed motions with this Court seeking to withdraw the reference to the Bankruptcy Court of the motion of the debtors for entry of an order authorizing debtors to reject certain energy contracts ("Withdrawal Motions"). A hearing on the Withdrawal Motions was set for January 4, 2006.

On January 3, 2006, FERC issued an "Order Providing Interim Guidance" ("FERC Order") in the FERC Proceeding in which it articulated its interpretation of the jurisdictional issues at issue in the matter now before the Court. California Elec. Oversight Bd., No. EL06-30-000. In its Order, FERC felt compelled to adopt as its policy the position of the Fifth Circuit in In re Mirant, 378 F.3d 511 (5th Cir. 2004) ("Mirant"), which FERC interpreted to hold that section 365 of the Bankruptcy

---

[3] The Bankruptcy Court originally scheduled a hearing on Calpine's request for a preliminary injunction for December 29, 2005, but FERC subsequently requested extensions to January 31 and then February 15, 2006. By Stipulation and Order dated January 19, 2006 FERC's time to answer or otherwise respond to the Complaint in the adversary proceeding was extended to March 1, 2006.

Code is not preempted by the Federal Power Act ("FPA"), that the district court could exercise jurisdiction over the rejection of filed rate energy contracts, and that a standard that takes into account the public interest would be required at the rejection hearing. FERC Order ¶¶ 7-13. FERC also noted its willingness to develop a record on the impact of rejection on the public interest for any upcoming rejection hearing. Id. ¶ 14.

On January 4, 2006, this Court ordered the withdrawal of the reference to the Bankruptcy Court of the motion of the debtors for entry of an order authorizing debtors to reject certain energy contracts ("Withdrawal Order") finding that, pursuant to 28 U.S.C. § 157, resolution of the questions required substantial and material consideration of both federal law and bankruptcy law and that neither the decision in Mirant nor the FERC Order definitively resolved the issues. (Withdrawal Hearing Transcript at 38-39.) By Stipulation and Order of the Court dated January 12, 2006, the Court ordered, inter alia, briefing on whether this Court had jurisdiction to resolve the Rejection Motions and, if so, what standard should be applied. By Stipulation and Order of the Court dated January 19, 2006, the reference to the Bankruptcy Court of the TRO Proceeding was withdrawn and given a case number in this Court of 06 Civ. 624. By Stipulation and Order of the Court dated January 23, 2006, the Official Committee of Unsecured Creditors ("Committee") was permitted to intervene and brief these issues. A hearing on the legal issues was held on January 26, 2006.

## II.   DISCUSSION

The Court is charged with interpreting the scope and possible conflict between the FPA and the Bankruptcy Code and must interpret the statutes so as to give effect to both. See Morton v. Mancari, 417 U.S. 535, 551 (1974).

5

## A. FERC Has Plenary Jurisdiction Over Filed Rate Energy Contracts, Including the Power Agreements Here

When Congress enacted the FPA in 1935, it provided that the interstate sale of wholesale electric energy is "affected with a public interest" and that federal regulation was necessary to protect the public interest. 16 U.S.C. § 824(a). The Supreme Court has noted that the principal purpose of the FPA is the protection of electricity consumers through the "orderly development of plentiful supplies of electricity . . . at reasonable prices." N.A.A.C.P. v. Federal Power Comm'n, 425 U.S. 662, 670 (1976) (citing 16 U.S.C. § 824a(a)). Although energy contracts are privately negotiated, the contracts must be filed with FERC and certified as "just and reasonable" to be lawful under the FPA, id. § 824d(a), and, as such, FERC is vested with the "exclusive authority to determine the reasonableness of wholesale [electricity] rates," Mississippi Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 371 (1988).

FERC's plenary authority over wholesale energy contracts led to the filed rate doctrine, first recognized in the wholesale-power context in Montana-Dakota Utilities v. Northwestern Public Service Co., 341 U.S. 246 (1951). The doctrine states that a utility's right to a reasonable rate under the FPA is the right to the rate which the FERC files or fixes and, except for review of FERC orders, a court cannot provide a right to a different rate. Mississippi Power & Light, 487 U.S. at 371. It has been widely recognized that the filed rate doctrine prohibits any collateral attack in the courts on the reasonableness of rates, and that the only forum for such a challenge is the FERC. Id. at 375. Though FERC has exclusive authority to modify filed rate wholesale energy contracts, its power to modify the rates is not limitless;

> FERC may not change a filed rate solely because the rate affords a public utility "less than a fair return" because "the purpose of the

> power given to the Commission . . . is the protection of the public interest, as distinguished from the private interests of the utilities . . . ." Fed. Power Comm'n v. Sierra Pac. Power Co., 350 U.S. 348, 355, 76 S.Ct. 368, 100 L.Ed. 388 (1956). Instead FERC can change a filed rate only when "the rate is so low as to adversely affect the public interest-as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." Id.

In re Mirant, 378 F.3d 511, 518 (5th Cir. 2004). Section 206 of the FPA authorizes FERC, after hearing, to change filed rates if it determines that they are unjust or unreasonable. 16 U.S.C. § 824e.

FERC's jurisdiction and the filed rate doctrine stretches past regulation of rates, 16 U.S.C. § 824d(c), and extends to the terms and conditions of wholesale energy contracts, see Mississippi Power & Light, 487 U.S. at 371 ("FERC's exclusive jurisdiction applies not only to rates but also to power allocations that affect wholesale rates"); Nantahala Power & Light Co. v. Thornburg, 476 U.S. 953, 966-67 (1986) ("[T]he filed rate doctrine is not limited to 'rates' per se."). A change to the duration of a filed rate energy contract, would also come under FERC's jurisdiction. See In re Permian Basin Area Rate Cases, 390 U.S. 747, 822 (1968) ("The regulatory system created by the Act is premised on contractual agreements voluntarily devised by the regulated companies; it contemplates abrogation of these agreements only in circumstances of unequivocal public necessity."); Pennsylvannia Water & Power Co. v. Federal Power Comm'n, 343 U.S. 414, 423 (1952) (holding that if an energy supplier "wishes to discontinue some or all of the services [the FPA] opens up a way provided [the supplier] can prove that its wishes are consistent with public interest"). Because, once filed with FERC, wholesale power contracts become the "equivalent of a federal regulation," California ex rel. Lockyer v. Dynegy, Inc., 375 F.3d 831, 839 (9th Cir. 2004) ("Dynergy"), the duty to perform under those contracts may be required, "not from the private law

7

of contract," but by FERC itself, Pennsylvannia Water & Power Co., 343 U.S. at 422; see also Blumenthal v. NRG Power Mktg. Inc., 104 F.E.R.C. ¶ 61,211 at 61,743 (2003) ("[T]he commission exercised . . . its authority under the [FPA], which is independent of authority arising from the contract.")

The Power Agreements that Calpine seeks to reject have been filed with FERC and, under normal conditions, altering the rates, terms, conditions, or duration of the contracts would require FERC involvement and approval. A solvent company could not choose to stop performance and expect anything other than swift FERC action. There are no provisions in the FPA that specifically limit FERC jurisdiction in the bankruptcy context. Quite the contrary, FERC, in its charge to maintain reasonable rates and uphold the public interest, must also consider the financial ability of a utility to continue service under a filed rate, a responsibility that would include similar considerations to those in the bankruptcy court. See Fed. Power Comm'n v. Sierra Pac. Power Co., 350 U.S. at 355. Conversely, FERC's lack of authority to modify a filed contract solely because it is in the interest of a private utility, suggests Congress thought no forum ought have such authority. Id.

**B.     Neither the Jurisdictional Grant to the Bankruptcy Courts, nor the Rejection Authority Limits FERC's Plenary Jurisdiction Over Filed Rate Energy Contracts; The Bankruptcy Code Contemplates Agency Action; Actions Taken Under the Bankruptcy Code Cannot Directly Interfere with the Jurisdiction of a Federal Agency to Act in its Regulatory Capacity**

Against FERC's vast authority over filed rate energy contracts, the Court searches the Bankruptcy Code and finds little evidence of congressional intent to limit FERC's regulatory authority. Absent overriding language, the Bankruptcy Code should not be read to interfere with FERC jurisdiction.

8

This is not to say that the jurisdiction of the Court under the Bankruptcy Code is not substantial. Indeed, Congress intended to grant comprehensive bankruptcy jurisdiction to the district courts so that they might "deal efficiently and expeditiously with all matters connected to the bankruptcy estate." Celotex Corp. v. Edwards, 514 U.S. 300, 308 (1995). As such, the Bankruptcy Code grants the district courts exclusive jurisdiction over "all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate," 28 U.S.C. § 1334(e), and original, but not exclusive jurisdiction over civil proceedings arising under Chapter 11, id. § 1334(b).[4]

Section 365(a) of the Bankruptcy Code allows the debtor or debtors-in-possession to "assume or reject any executory contract of the debtor." 11 U.S.C. § 365(a). Such rejection amounts to an intentional breach of the contract, transforming the contractual obligations into a claim for damages treated as all other unsecured claims for damages against the estate. Id. § 365(g); Mirant, 378 F.3d at 519. The Supreme Court in N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 528 (1984), found that rejection is allowed for "all executory contracts except those expressly exempted" and that rejection is "vital to the basic purpose to a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." There, the Court confronted the interplay between the bankruptcy court's power to reject a collective-bargaining agreement and the authority of the National Labor Relations Board

---

[4] But see Bd. of Governors of the Fed. Reserves Sys. v. MCorp Financial Inc., 502 U.S. 32, 41-42 (1991) (holding that the jurisdictional grant to bankruptcy courts under 28 U.S.C. § 1334(b) concerns only the allocation of jurisdiction between bankruptcy courts and other courts, not administrative bodies, as is the question here).

9

("NLRB") over collective bargaining agreements under the National Labor Relations Act ("Labor Act").

In Bildisco, however, the parties conceded the rejection power of the bankruptcy court. Id. at 523. Further, the Bankruptcy Code contains express language exempting collective bargaining agreements under the Railway Labor Act, but not of the type of agreement at issue before the Court. Id. at 522-23 (citing 11 U.S.C. § 1167).[5] Most importantly, the NLRB does not possess exclusive jurisdiction over the terms and conditions of collective bargaining agreements, thus, in Bildisco, there was no jurisdictional conflict. Id. at 526. The NLRB is concerned only with the negotiation process, not the terms and conditions of the negotiated contract. Where the concerns of the NLRB did create conflict, the Court gave voice to the applicable portions of the Labor Act and thus limited the reach of the Bankruptcy Code. See id. (interpreting provisions and policies of the Labor Act to require the debtor-in-possession to bargain with the Union and to prohibit bankruptcy court action or intervention until the parties have been given the opportunity to voluntarily negotiate a solution). In sum, the Court in Bildisco held that where there is no conflict with a federal regulatory regime, a bankruptcy court should be allowed the fullest expression of its power and jurisdiction, including the power to authorize rejection, but where there is conflict, the power of the bankruptcy court must yield to that of the federal agency. See infra.

---

[5] The Court noted that § 1167 "expressly exempts collective-bargaining agreements subject to the Railway Labor Act, but grants no similar exemption to agreements subject to the [Labor Act]." Bildisco, 465 U.S. at 522.

The Bankruptcy Code itself supports this conclusion by contemplating agency action during the pendency of a reorganization.[6] Section 362(b)(4) expressly exempts a federal agency like FERC from the automatic stay provision of the Bankruptcy Code listed at § 362(a). The section allows "the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power," 11 U.S.C. § 362(b)(4),[7] and "allow[s] governmental actions to encroach on the [bankruptcy] court's control of debtors' affairs . . . even though such actions may affect debtor assets." Eddleman v. United States Dep't of Labor, 923 F.2d 782, 790 (10th Cir. 1991), overruled in part on other grounds by Temex Energy, Inc. v. Underwood, Wilson, Berry, Stein & Johnson, 968 F.2d 1003, 1005 n.3 (10th Cir 1992). There is little doubt that after Calpine filed for reorganization, FERC could have exercised its regulatory power and ordered Calpine's continued performance under the Power Agreements that Calpine seeks to reject. Indeed, exercise of this power was precisely what Calpine hoped to avoid by obtaining the temporary restraining order against FERC.

---

[6] The reliance by Calpine and the Committee on the Supreme Court's decision in FCC v. NextWave Personal Communications, Inc., 537 U.S. 293, 304 (2003), to refute this statement is misplaced. The Court in NextWave said that 11 U.S.C. § 525, which expressly forbids, inter alia, government agencies from discriminating against a debtor by refusing to grant or by revoking a license on the ground that the debtor had failed to pay a dischargeable debt when due, means precisely what it says, such that the FCC could not discriminate against the debtor NextWave and cancel its radio spectrum license for failure to pay a dischargeable debt. Were the facts here like those in NextWave, this Court would be confronting a provision of the bankruptcy code that expressly disallowed federal agencies from exercising their regulatory jurisdiction during the pendency of a bankruptcy appeal. But the opposite provision exists in § 362(b)(4).

[7] See also 11 U.S.C. § 1129(a)(6) (prohibiting court-confirmation of a reorganization plan unless, inter alia, "[a]ny governmental regulatory commission with jurisdiction . . . over the rates of the debtor has approved any rate change provided for in the plan").

Having determined that the Bankruptcy Code does not expressly limit FERC's jurisdiction, and that it contemplates agency action during the pendency of a reorganization, it is clear the bankruptcy court's authority cannot be exercised so as to interfere with the jurisdiction of a federal agency acting in its regulatory capacity. See, e.g., MCorp Financial Inc., 502 U.S. at 41 (holding that scrutiny in the bankruptcy court of an administrative enforcement action is "problematic" because it both "conflicts with the broad discretion Congress has expressly granted many administrative entities and because it is inconsistent with the limited authority Congress has vested in bankruptcy courts" (emphasis added)); In re Nextwave Personal Communications, Inc., 200 F.3d 43, 55 (2d Cir. 1999) ("Nextwave I") (holding that a bankruptcy court has jurisdiction over those transactions that "do not touch upon" a regulatory commission's authority and lacks jurisdiction where debtors seek to "collaterally attack or impair" a regulatory scheme); cf. Bildisco, 465 U.S. at 526 (allowing rejection of a collective bargaining agreement where doing so did not conflict with NLRB jurisdiction). The filed rate doctrine is a specific manifestation of this principle, and no less applicable in the bankruptcy context. See Mirant, 378 F.3d at 519 (stating that bankruptcy court would have jurisdiction to reject a wholesale power contract only if so doing does not violate the filed rate doctrine); In re NRG Energy, Inc., No. 03 Civ. 3754 (RCC), 2003 WL 21507685, at *4 (S.D.N.Y. June 30, 2003) ("[W]ere the issues before the Court not to affect FERC's regulatory authority, the Court would properly possess jurisdiction [to enforce the bankruptcy court's decision]."). Thus, in the situation presented here, the fundamental and dispositive issue for the Court to consider is whether rejection of the Power Agreements directly interferes with FERC's exclusive jurisdiction and regulatory authority over wholesale power contracts or otherwise constitutes a collateral attack of the filed rate.

## C. Authorizing Rejection in this Case Would Directly Interfere with FERC's Jurisdiction and Would Constitute a Collateral Attack on the Filed Rate

The Court holds that it lacks jurisdiction to authorize the rejection of the Power Agreements because doing so would directly interfere with FERC's jurisdiction over the rates, terms, conditions, and duration of wholesale energy contracts. Calpine seeks rejection based on dissatisfaction with the rates (see Posoli Aff. ¶ 28 ("[Calpine is] ready and willing to supply the same amount of wholesale electric power–but at competitive market prices.")), thus constituting a collateral attack on the filed rate itself, see Mississippi Power & Light, 487 U.S. at 375, and seeks release from specific performance under the contract (albeit not from damages), thus altering the duration of the contract, which cannot be accomplished outside the exclusive jurisdiction of FERC, In re Permian Basin Area Rate Cases, 390 U.S. at 822. Because there is nothing in the Bankruptcy Code that limits FERC's jurisdiction, Calpine cannot achieve in Bankruptcy Court what neither it, nor any other party in this case, nor any other federally regulated energy company in the country could do without seeking FERC approval: cease performance under the rates, terms, and conditions of filed rate wholesale energy contracts in the hopes of getting a better deal.

It is of no moment that rejection in the bankruptcy court constitutes a breach. See 11 U.S.C. § 365(g). Calpine and the Committee argue bankruptcy courts have a broad power to reject executory contracts, rejection constitutes breach, FERC has exclusive jurisdiction over approval, modification, or termination of wholesale energy contracts, not over breaches, and as such rejection is outside of FERC's exclusive jurisdiction. The elegance of this argument is betrayed by the fact that the "breach" here does create a typical dispute over the terms of a contract, but the unilateral termination of a regulatory obligation.

This is not a run-of-the-mill contract dispute. The cases cited by Calpine and the Committee where courts have exercised jurisdiction over breach of wholesale energy contracts, or where FERC has declined jurisdiction over breach issues, involved alleged breaches the resolution of which called for simple contract interpretation well within the jurisdiction of the courts. See, e.g., Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571 (1981) (finding that the interpretation of a contract clause raised only questions of state law); PPL Montana, LLC, 96. F.E.R.C. ¶ 61,313, at 62,208 (2001) ("[T]he Commission does not possess greater expertise than a court in the interpretation of contracts."). The breach here is not a dispute, nor does it require any contract interpretation, it is a complete cessation of performance under the terms and conditions of the Power Agreements.

In addition, the unenforceable promise from Calpine that it will continue to supply energy hardly constitutes performance under the terms. In at least some of the Power Agreements submitted to the Court, volume energy supply at a particular rate is but one of the terms filed with FERC; others include, for example, Calpine's construction of generation facilities, requirements to provide energy from renewable sources, and emergency supply of quantities of energy into the spot market. And at base, rejection of the Power Agreements would release Calpine from its contractual duty to provide energy, good faith promises notwithstanding.

Most importantly, just as regulatory action was required to transform the terms and conditions of the Power Agreements from mere contracts into regulated duties, Dynergy, 375 F.3d at 839, so also is regulatory action from FERC required to eliminate those duties, cf. Pennsylvania Water & Power Co., 343 U.S. at 422 (finding that once the energy contracts were filed, the FPA, not contract law, controls). With rejection, a bankruptcy court eliminates those duties. But what FERC giveth, only FERC may taketh away.

The Court is aware that its holding here is in obvious conflict with the holding of the Fifth Circuit in Mirant, 378 F.3d 511, and the conclusions of the FERC Order.[8]  Mirant is not controlling here and relies heavily on Fifth Circuit cases that have no Second Circuit corollaries.  Nevertheless, were the Court to adopt and apply Mirant faithfully, it would still find that FERC has exclusive jurisdiction over the fate of the Power Agreements.

In Mirant, public utility PEPCO, pursuant to deregulation legislation, sold its electric generation facilities and assigned most of its power purchase agreements to Mirant, a power purchaser and provider.  378 F.3d at 515.  Because some of the power purchase agreements contained language that foreclosed PEPCO from assigning them, PEPCO and Mirant entered into a separate agreement (also FERC-regulated), which provided that PEPCO would continue to buy energy under the unassigned agreements and that Mirant would purchase that energy from PEPCO at the filed rates set in those contracts.  Id.  When Mirant later filed for Chapter 11 bankruptcy, it sought to reject the contracts that bound it to buy the energy from PEPCO.  Id. at 516.  The district court withdrew the reference to the bankruptcy court of the rejection motions and later found, inter alia, that the FPA deprived it of jurisdiction.  Id. at 516-17.

---

[8] The FERC order broadly adopts the conclusions of the Mirant Court, and thus the below discussion of the decision also applies to the FERC Order.  The Court adds that with respect to the FERC Order, that FERC does not have the authority to determine the Court's jurisdiction. (See Withdrawal Order at 38-39).  Moreover, the Order appears to be FERC's attempt to fulfill its regulatory responsibilities in light of the constraints imposed on it by the bankruptcy court's temporary restraining order, and not necessarily a final announcement.  The Order was "interim" because FERC had no opportunity to hear from the parties on the legal issues nor the chance to develop the factual record, circumstances which do not counsel deference. See Christensen v. Harris County, 529 U.S. 576, 586 (2000) (finding deference to an agency's decision is warranted only after such decision is rendered on an issue within its particular expertise and after formal adjudication or notice-and-comment rulemaking).  It light of these considerations, the Court believes its determination here will not create a "jurisdictional vacuum" as Calpine and the Committee suggest.

The Fifth Circuit reversed the district court. It recognized first that a rejection of a contract under § 365 constitutes a breach, not a modification of the contract. Id. at 519. Central to the Fifth Circuit's holding is the notion that "[w]hile the FPA does preempt breach of contract claims that challenge a filed rate, district courts are permitted to grant relief in situations where the breach of contract claim is based upon another rationale." Id. Though above-market rates were part of Mirant's decision to reject the contracts, the court found that Mirant's main justification was that it did not need the energy it was purchasing from PEPCO to fulfill its own obligations to supply electricity; "Mirant may choose to reject this agreement as unnecessary to its reorganized business because it represents excess capacity in its system to supply electricity." Id. at 520. The only thing separating Mirant's rejection motion from being an unlawful collateral attack on the rate was the fact that it did not want the energy at all. Indeed, in reaching its holding, the Mirant Court quoted Fifth Circuit precedent that held: "The district court would have jurisdiction if [the debtor] claimed that it cannot take [the supplier's] electricity regardless of price. If, however, [the debtor] can fulfill its purchase obligations at lower rate, then [the debtor] merely seeks rate relief not available in district court." Id. (quoting Gulf States Utils. Co. v. Ala. Power Co., 824 F.2d 1465, 1472 (5th Cir. 1987)). The Court concluded that, under the circumstances, the rejection of the contracts would only have an "indirect effect" on the rate, and thus the FPA would not preempt the district court from exercising its jurisdiction under the Bankruptcy Code.

As noted, this Court does not construe the filed rate doctrine so narrowly as to only reach modifications of the rate. Just the same, Mirant's holding militates against Calpine. Here, while Calpine expressly states that it seeks relief from the Power Purchase Agreements because it is forced to sell energy at rates far below market, it does not offer "another rationale." Id. at 519. Calpine

16

remains "ready and willing to supply the same amount of wholesale electric power—but at competitive market prices" (Posoli Aff. ¶ 28), so there is no excess capacity issue presented, but merely a desire to get a better rate.[9] The Mirant Court clearly held that it would find FPA preemption where, as here, a debtor was able to fulfill its obligations but only at a lower rate. Mirant, 378 F.3d at 520. Rejection in such a situation does not "indirectly effect" the filed rate; it is a collateral attack on it.

The Court's conclusion in this case is consistent with general policy considerations, including the proper allocation of power in our system of separated powers. The Supreme Court has held that "[t]he clear assignment of power to a branch . . . allows the citizen to know who may be called to answer for making, or not making, those delicate and necessary decisions essential to governance." Loving v. United States, 517 U.S. 748, 758 (1996). This principle seems particularly applicable here. By holding that FERC has exclusive jurisdiction to modify or terminate the Power Agreements in this case, an issue of great public interest will be heard in a branch accountable to the electorate in a forum that specializes in considering the public interest.

To this end, although the Court takes no formal position on what standard would apply were it to have jurisdiction, the Court does note that the standard issue may very well compel the Court's finding that it lacks jurisdiction altogether to authorize the rejection of the Power Agreements. Both the Mirant decision and the FERC Order predicate bankruptcy court jurisdiction to reject energy contracts on the belief that the public interest is adequately considered at a rejection hearing, at least in part through FERC's participation. See Mirant, 378 F.3d at 525 ("Use of the business judgment

---

[9] Moreover, rejecting a contract that would lead to excess capacity, that is, unwanted, unused energy, in no way conflicts with one of the central concerns of the FPA, the stable and consistent supply of energy. See N.A.A.C.P, 425 U.S. at 670.

17

standard would be inappropriate because it would not account for the public interest inherent in the transmission and sale of electricity . . . . We presume that the district court would also welcome FERC's participation . . . ."); FERC Order ¶ 12 (displaying willingness to "inform the Bankruptcy Court [on] the impact on the public interest of a potential rejection"). This process would allow the bankruptcy court to sit in judgment of FERC's determination of the public interest, a prospect prohibited by established case law. See MCorp Fin. Inc., 502 U.S. at 41 (disallowing the bankruptcy court to scrutinize the legitimacy of federal agency action); NextWave I, 217 F.3d at 135 (holding that a federal agency "need not defend its regulatory calculus in the bankruptcy court"); In re NRG Energy, 2003 WL 21507685 at *3 (holding that, under the FPA, actions taken by FERC are reviewable only by a court of appeals). To the extent that, under the FPA, the fate of wholesale power contracts cannot be determined without consideration of the public interest, the executive agency FERC should determine that interest. Cf. Smith v. Hoboken R.R. Warehouse & S.S. Connecting Co., 328 U.S. 123, 131 (1946) ("When the public interest, as distinguished from private, bulks large in the problem, the solution is largely a function of the legislative and administrative agencies of government with their facilities and experience in investigating all aspects of the problem and appraising the general interest.")

**E.     Because FERC has Exclusive Jurisdiction over the Disposition of the Power Agreements, the Court Vacates the TRO Restricting FERC Involvement**

Having determined that this Court lacks subject matter jurisdiction over the disposition of the Power Agreements and that exclusive authority to change, modify, or terminate the agreements lies with FERC, it is appropriate for the Court to vacate the temporary restraining order currently preventing FERC from deciding issues pending before it, or accepting new petitions.

## III. CONCLUSION

In light of the foregoing, the Court dismisses the motions to reject certain energy contracts in case numbers 05 Civ. 10842 (RCC), 05 Civ. 10861 (RCC), and 05 Civ. 10875 (RCC) for lack of subject matter jurisdiction, and vacates the temporary restraining order in case number 06 Civ. 624 (RCC).

**So Ordered:** New York, New York
January 27, 2006

*Richard Conway Casey*

**Richard Conway Casey, U.S.D.J.**